BRACEWELL



September 9, 2022

**VIA ECF**

Honorable Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

    Re: <u>United States v. Urooj Rahman</u>,
       <u>Criminal Docket No. 20-203 (BMC)</u>

Dear Judge Cogan:

    This memorandum is respectfully submitted on behalf of Urooj Rahman, who is scheduled to be sentenced by the Court on September 29, 2022, for conspiracy. As the Court knows, two years ago during the protests that followed the murder of George Floyd, Urooj threw an incendiary device into an abandoned auxiliary police vehicle. Her conduct that night was a marked deviation from her otherwise exemplary life. For the reasons discussed below, we submit that a further prison term is not called for, and that a sentence of time served is the appropriate disposition of this case. <u>See</u> <u>Pepper v. United States</u>, 562 U.S. 476, 487-88 (2011)("the punishment should fit the offender and not merely the crime").[1]

---

[1]   Urooj served 28 days in the MDC before the Second Circuit released her on bail.



A.  <u>Introduction</u>

At our request, Urooj was evaluated by Dr. Leslie Lebowitz, a clinical psychologist whose work centers on the assessment and treatment of trauma. Her report is attached as Appendix A. Dr. Lebowitz writes that "[b]eneath her surface functionality [Urooj] is gravely compromised." In Part B below, we discuss Urooj's "functionality," her many accomplishments, including her commitment to social justice and her deep empathy for others. Part C discusses Dr. Lebowitz's report. In Part D, we address other factors that support a time-served sentence.

B.  <u>Urooj's Commitment to Social Justice and Empathy for Others</u>

Urooj Rahman was born in Karachi, Pakistan, on November 10, 1988, the youngest of four children. Her father was an accountant and her mother a homemaker and match-maker, helping people find spouses. At four, Urooj and her mother came to America, joining her father, who had immigrated two years earlier when political tensions in Pakistan were on the rise. After frequent moves, the family settled in Brooklyn in 1995, which has been Urooj's home ever since.

Urooj attended Brooklyn Tech High School in Fort Greene, where her interest in civil rights developed. <u>See</u> letter of Richard Lubell ("I remember challenging many [of my students] to work in fields of human rights and justice; Urooj was one of those who clearly heard my exaltations").[2] After high school, Urooj attended Fordham University and then Fordham Law School. Attending law school had been her goal since high school, and Urooj took her studies seriously. <u>See</u> letter of Wen Vo ("[s]he could easily be found in the library studying; her proudest

---

[2]  Letters from Urooj's family and supporters are attached as Appendix B.


achievement was when she graduated from Fordham Law School"). She was "in the small minority of students at Fordham Law who pursued public interest-related courses and shared a passion for international human rights questions." Letter of Thomas Callahan.

Professor Chi Adanna Mgbako, the Director of the International Human Rights Clinic at Fordham Law School, recalls Urooj's dedication to human rights and her "passion[] and eloquen[ce]":

> During our human rights seminar course, Urooj exhibited a thoughtfulness regarding the complex issues we addressed each week. I can still see her sitting in front of me, speaking passionately and eloquently about economic and social rights, international sexual violence prosecutions, and cultural relativism. She is also a great listener and engaged the other students' opinions in a thoughtful manner even when she did not agree with their assertions.

Letter of Chi Adanna Mgbako.

While in law school, Urooj participated in fellowship programs in Northern Ireland and the Middle East. In Northern Ireland, she took a class on international conflict resolution that focused on the "Troubles" and interned at the Northern Ireland Solicitor's Office. See letter of Michael M. Martin ("[s]he was always engaged in the class dialogue, which at times was necessarily emotionally and intellectually intense"). Professor Martin writes that he has "given a handful of A+'s in my 22 years of teaching, and Urooj received one of them for her outstanding work that summer." Id.; see also letter of Brian Doherty, Northern Ireland solicitor, ("[s]he was commended to me as professional, intelligent and collegial, all of which qualities were borne out in her work for me"). In Israel and Palestine, she joined other students in working to promote


human rights.  See letter of Jordan Manalastas ("[o]ur work was grim" but Urooj's character traits -- her "kindness and empathy . . . passion and principle" -- "were evident").

In her third year of law school, Urooj went to South Africa and did know-your-rights training for LGBTQ individuals who had fled from Uganda, Kenya, Zimbabwe and Tanzania to avoid persecution.  Her experiences resulted in her being named a 2015-16 Tolan Fellow in International Human Rights, a prestigious post-graduate fellowship.  In his letter to the Court, John D. Feerick, the former Dean of Fordham Law School, writes this about Urooj's being awarded the Tolan Fellowship:

> I recall meeting with her in 2013 to offer her career guidance.  She expressed in that meeting a social justice commitment for her life as a lawyer.  Influenced by that and by her humble background, I recommended her in January 2014 for the law school's prestigious James E. Tolan International Human Rights Fellowship.  In my recommendation, I described her as a "warm and caring person, deeply interested in the well-being of others."  I noted as well her extracurricular activities with a variety of non-profit organizations and how professional and appropriate she was in our 2013 summer law program, calling her a "credit to Fordham."

Letter of John D. Feerick.

As part of her fellowship, Urooj spent nine months in Istanbul assisting refugees seeking asylum.  She "jumped at the chance to work with refugees in Turkey when the country was overwhelmed with asylum requests spilling over from the Syrian civil war and other atrocities."  Letter of Pearlie Wong; see also letter of Chi Adanna Mgbako ("Urooj's legal advocacy [in Turkey] serve[s] to highlight the immense level of commitment and adherence to the social justice and human rights fields she has dedicated herself to"); letter of Han Le ("[h]er inexhaustible drive to do good, during a particularly dark period in Turkey . . . is something that



made an impression on me long after I left the country"). Dan Le, who befriended Urooj in Turkey, explains that Urooj's work with refugees "took a physical, emotional, and mental toll on her but she never complained; it was inspiring to see how much she put into helping others." Letter of Dan Le.

On returning to Brooklyn in February 2017, Urooj went to work on Bob Gangi's campaign for Mayor of New York City, serving as its policy director. Gangi made economic and social justice the centerpieces of his long-shot campaign. Luke Messina canvassed the city with Urooj and came to respect her greatly:

> Something that I will never forget about Urooj was how kind and compassionate she was to complete strangers who needed help. If someone was sleeping on the ground, she would approach them to see if they were ok, and if they needed food . . . . Buying food, giving a metrocard swipe, or even opening her home. I genuinely do not know another soul as open, kind, or concerned for others. I have worked on my fair share of campaigns, and I do not often keep in touch with those I work with. The reason I still count Urooj as a friend 4 years later is because you don't easily forget people like her . . . . She is someone who genuinely wants to make the world a better place.

Letter of Luke Messina; see also letter of Tiffany Berruti (her "commitment, compassion, and generosity of spirit is what I remember most about working with Urooj"); letter of Alicia Bella Cabezas ("[s]he taught us every day through her leadership, knowledge and commitment"). Maesha Meto, who campaigned with Urooj, recalls being "inspired by [her] . . . deep compassion for people" and calls her "the most beautiful person I've ever met." Letter of Maesha Meto. Mr. Gangi describes Urooj as someone who "pressed us often to develop and support policy positions aimed at achieving true justice and equity for all New Yorkers." Letter of Robert Gangi.



In the summer of 2017, Urooj took a three-week leave from the campaign to travel to Athens to provide support to refugees in the city. At the time, there were 60,000 refugees in Greece, living in camps and squats and in dire need of legal assistance. Loubna Qutami, now an Assistant Professor at the University of California, worked with Urooj in Athens and writes this:

> While Greece is home to refugees from across the African and Asian continent, Urooj did not discriminate and instead provided support for refugees of different ethnic, religious, and racial backgrounds, and political subjectivities. She saw the humanity in every person and treated them with dignity and respect.

Letter of Dr. Loubna Qutami; see also letter of Samira Shirdel (I marveled at her ability to work tirelessly "to the limits of her capacity" and at "the depth of [her] compassion"). Her co-workers spent long evenings together "sharing tears about the devastation and crisis [they] were witnessing." Id.

After the mayoral election, Urooj went to Cairo for nine months to do similar refugee work. Lucy Pedrana, who worked with Urooj there, describes her as a "dedicated advocate for vulnerable people with a strong passion and commitment to justice . . . informed by [her] . . . compassion and empathy for others." Letter of Lucy Pedrana. She tells this story:

> One day, I saw Ms. Rahman enter our office, and I could see from her facial expressions that she was sad. She explained she had just come back from accompanying a child to attend his refugee status determination interview. During the cab ride back, the child had asked her for a pen, paper and a school bag because all he wanted to do was go to school and learn. Ms. Rahman expressed that she knew she had fulfilled her role as his legal representative, but she could feel the unfairness of his situation -- a young boy alone in Cairo who did not possess the resources of a pen, pencil and school bag to go to school. Shortly after this conversation, Ms. Rahman approached the other departments at StARS (e.g. education and psychosocial) to try to get the child an education grant and school supplies, even though it was not a requirement of our job.


<u>Id.</u>

On her return from Cairo, Urooj took a position with the Housing Unit at Bronx Legal Services.  (The unit was expanded after the state legislature enacted a law affording indigents a right to counsel in eviction cases.)  "The Bronx is one of the most economically under-resourced communities in the country [and] Ms. Rahman chose to go where the need was greatest."  Letter of Aimee Carlisle.  The job was relentless.  As a fellow lawyer writes, "[t]he emotional toll of working with clients [in] crisis compounds the emotional toll of practicing in what can often be a very uncivil forum," where adversaries are frequently hostile and disrespectful.  Letter of Johanna Ocana.  Urooj "fought tirelessly to prevent numerous low-income tenants from facing [eviction] and homelessness" and to ensure that their voices were heard.  Letter of Cristina Castro.  She spent long hours -- 9:00 a.m. to 7:30 p.m., not counting an hour travel each way -- working for clients who desperately needed an advocate.  <u>See</u> letter of Johanna Ocana ("[o]n many nights, Ms. Rahman worked after the office had closed on cases that required extra attention").

Urooj's colleagues in the Bronx office have written letters extolling her dedication to her clients.  Jackeline Solivan, her supervisor in the office, writes that Urooj "was a zealous advocate who pushed agencies to assist her clients, landlords to provide safe housing . . . and housing court to issue decisions protecting her client's rights"; <u>see also</u> letter of Sara Smith (Housing Court "is not an easy place to work, but I was always extremely impressed with Ms. Rahman's ability to stand up for . . . her clients in a professional manner"); letter of Norey Navarro ("Urooj treated her clients with utmost compassion, and effectively handled the pressures of our

BRACEWELL



job with confidence"); letter of Sylvia Figueroa ("[s]he would come to [the] office with an attentive attitude ready to encourage and lend an ear to anyone of our staff at a moment's notice").

Among the letters to the Court is one from Philip Prater, whom Urooj represented when his landlord threatened to evict him. Mr. Prater writes:

> Ms. Rahman met with me at her office on several occasions to meticulously and painstakingly explain tenant - landlord law, review the landlord's claim and explore options for my defense. Her legal knowledge and demeanor put me at ease, as I was very much confused by the whole process . . . . Miss Rahman proved to be a workhorse . . . . [Her] skillful negotiations with the opposing attorney resulted in the landlord dropping the request to evict me and agreeing to a court stipulation - very much in my favor.

Letter of Philip Prater. In all of these ways, Urooj's efforts, here and abroad, have involved "hands-on personal sacrifices, which have had a dramatic and positive impact on the lives of others." United States v. Cooper, 394 F.3d 172, 177 (3d Cir. 2005).

Just as Urooj was a good colleague to her fellow attorneys, she has been a good friend to many. All of her friends emphasize her empathy and compassion. See letter of Amnah Almukhtar ("[h]er empathy is so strong that she carries the hurt of others"); letter of Meghna Philip ("Urooj was always a cheerleader for me and our other friends"); letter of Kulsoom Ijaz ("[s]he was and still is a source of comfort when my work is daunting, strength when I was experiencing distress"); letter of Humzah Soofi ("Urooj is one of the most empathetic and compassionate people I know; her generosity is notorious"); letter of Fatima Amin ("[s]he is the first person I would think of if I needed anything because of how caring and responsible she is"); letter of Robert Wolf (I have had "many ups and downs, . . . but I always found comfort and peace in Urooj"); letter of



Sarah Amin ("[o]ver the 25 years that I have known her, Urooj has only exhibited love, compassion and support"). In Wen Vo's words, Urooj "is a rare type of friend who would move mountains to be there for you." Letter of Wen Vo.

Urooj's friends are also aware of her dedication to her mother, now 79, who suffers from high blood pressure, vertigo, fatigue, arthritis, and hearing loss. See letter of Shagufta Rahman ("after [our] dad passed away she stepped in and sacrificed her personal life to take care of all my mother's needs"); letter of Sara Smith ("Ms. Rahman lives with and cares for her elderly mother and always prioritizes her mother's needs"). In her letter to the Court, Urooj's mother describes her dependency on Urooj:

> My husband passed away 9 years ago and ever since then Urooj has been the primary person taking care of me and living with me. She had the choice of moving away, but she chose to stay with me as she did not want me to live alone in my old age. She is the most caring, loving, and kindest person I know. She takes care of all my daily needs like taking me to doctor's appointments, going for my covid vaccine shots, grocery shopping, cleaning the house and making sure I take my medicine on time. In addition to all this, she is also my companion. Without her I would be alone.

Letter of Arjumand Rahman. As her close friend Saquib Usman writes, "[i]f Urooj is sent to prison, her mother's care would be in great jeopardy." Letter of Saquib Usman.

Since her arrest in this case, Urooj has worked at Witness to Mass Incarceration, a program that assists people returning home from prison, and with Bob Gangi at the Police Reform Organizing Project ("PROP"), which sponsors a court-monitoring program among its justice-related initiatives. The directors of those programs sing her praise. See letter of Evie Litwok, Executive Director, Witness to Mass Incarceration ("I've come to know Urooj as someone who


really cares about achieving true justice in our community and society"); letter of Bob Gangi ("[h]er experience as a seasoned lawyer and professional advocate serves us well in discussions with our young interns and volunteers").[3] Her commitment to social justice remains at her core. <u>See</u> letter of Jordan Manalastas ("[t]he fact that she's continued to work in the public interest during the pendency of her case . . . says even more" about her).

C.  <u>Dr. Lebowitz's Report</u>

As noted, the report of Dr. Leslie Lebowitz, a psychologist and leading expert on trauma, is attached as Appendix A. Dr. Lebowitz interviewed Urooj for approximately 20 hours and spoke with her sister Shagufta, her brother Naseem, and two close friends. We sought Dr. Lebowitz's opinion because of the question that looms over this case: why would a young lawyer with no history of violence and no association with any radical group toss a Molotov cocktail into a police car and jeopardize all that she had worked for? Dr. Lebowitz's report discusses Urooj's trauma-filled life, which made her susceptible to the passions of that night.

---

[3]      Ms. Litwok's letter bears extended quotation:

On many occasions we worked together on getting resources and providing support to formerly incarcerated individuals who were starting anew after reentering society . . . . Urooj was always trying to come up with innovative ways to provide reentry support. She helped with our project that supported and mapped out all of the small businesses started by formerly incarcerated people across the country. Urooj has tremendous love and devotion to wanting a better life for all people. She is passionate about these public interest and services issues.

Letter of Evie Litwok.


Dr. Lebowitz begins her report by describing Urooj's childhood, which was

dominated by █████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

There was other early trauma as well. █████████████████████████

████████████████████████████████████████████████ At 11, when

the World Trade Center was attacked, Urooj experienced the harassment that was all too common

for Muslims living in the city. She was called names ("ugly Indian," "hairy monkey") and begged

her mother not to wear a hijab on the street. As Dr. Lebowitz explains, "[t]his compendium of

adversity" left Urooj "at the doorstep of adulthood without the ability to adequately manage and

BRACEWELL



regulate her feelings" and "subject to incapacitating depression, panic, and uncontrollable obsessional thinking."  Rpt. 6-7:

> Heading into adulthood, Urooj searched for ways to respond to what she had undergone and what she was feeling.  She sought out meaningful work that might address some of the inequities she had experienced and tried to find a relationship that would quiet her fears and allow her to feel safe.  Unfortunately, both of these strategies exposed her to more traumatic stress with which she was ill-equipped to cope.

Rpt. 7.

Dr. Lebowitz explains that Urooj's work with refugees and in Housing Court in the Bronx "sharpened her understanding of the broad forces bearing down on the marginalized and displaced people, but it also burdened her with more exposure to traumatic stress."  Rpt. 8.  Her ▮ abusive relationships ▮ only increased her sense of despair:

> [Her] relationships were invariably tumultuous and controlling and often emotionally and physically abusive . . . . ▮
> She responded primarily by cowering – ▮
> Sometimes, anger got the best of her, and she lashed out.  This was invariably followed by deep regret, guilt, and appeasement.  On occasion, she ran away, but she always returned, desperate to accommodate – to "fix" the relationship and make it better.  The end of each relationship was marked by psychological collapse:  she became profoundly depressed, ruminative, and actively suicidal.  No matter how abusive the relationship, she did not feel that she could survive its ending.

Rpt. 9-10. Such intimate partner violence can produce feelings of helplessness, depression, anxiety and post-traumatic stress, all of which Urooj has experienced.  See Susan Lagdon, et al., Adult experience of mental health outcomes as a result of intimate partner violence, 5 Eur. J. Psychotraumatology (2014).



**BRACEWELL**

All of this played out on May 29, 2020. Shortly before, ███████████████ ████████████████████████████ and had spiraled into depression. As Dr. Lebowitz writes, she "felt angry, sad, self-loathing, despairing and hopeless about her life [and] was unable to eat." Rpt. 16.[4] When she learned of George Floyd's murder (and saw the shocking images on television), she was filled with grief and horror. Thinking that focusing on issues outside herself might ease her pain, Urooj went to the demonstration at the Barclay Center in downtown Brooklyn. There, the scene was far more chaotic and alarming than she had expected.[5] Frightened to be alone with her thoughts and feelings, Urooj reached out to her friends, including Colin Mattis. Over texts, he described tearing up as he tried to figure out how to talk to the children in his care about George Floyd's death. Urooj knew that Colin did not usually show such emotion, and his texts affected her deeply.

---

[4] ██████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████

[5] The conduct of NYPD officers on May 29 was hardly exemplary. A lawsuit filed by the New York Attorney General against New York City alleges that "NYPD Officers engaged in a pattern of indiscriminately striking protestors using blunt instruments, including batons and bicycles, without provocation or justification," at times "aiming batons at protestors' heads . . . with potentially deadly force"; that officers "us[ed] pepper spray indiscriminately against protestors who were not posing a threat to any individual or actively resisting arrest"; and that officers "repeatedly . . . us[ed] kettling tactics, excessive force and threats of force to detain peaceful protestors." See People of the State of New York v. City, Civ. Action No. 21-cv-322 (S.D.N.Y.) ¶¶ 82, 131, 213. None of this was lost on Urooj, who saw a senior police officer punch a protestor in the face with such force that the protestor's blood splattered on the officer's white shirt; witnessed officers swinging their batons wildly at protestors, who were offering no resistance; and felt her skin burn from pepper spray.


Later that evening, Urooj met up with Colin near Fort Greene. On an empty stomach, she drank vodka that he had brought and became quite drunk, which further clouded her judgment. What followed is the incident for which Urooj and Colin stand convicted.

*   *   *

Dr. Lebowitz ends her report this way:

> Urooj went to the march [on May 29] in a deeply deteriorated state. She felt loathsome, desperate, disempowered, sad and angry. At the march, she was flooded by additional traumatic feelings and associations. This intensified the low-grade dissociation that had plagued her throughout her life and which had become more acute during the weeks leading up to May 29 ███████████████████. She also experienced the events of the day through the lens of her prior personal trauma, both ██████, in relationships and abroad. These prior, unresolved experiences freighted her experience that night with vivid and painful feelings and associations. Frightened to be alone, she was highly motivated to feel close to Colin and to avoid any conflict with him. Drinking and engaging in a mutual activity was an expression of this need. Getting drunk was also an effort to numb her feelings of anxiety, which it did. Numb, disassociated and inebriated, she was disconnected from a meaningful awareness of what the consequences of her actions might be.

Rpt. 19-20. Urooj's "deeply deteriorated state" does not excuse her conduct that night, but helps explain why she took the unlawful and uncharacteristic action that she did.

D.      Other Considerations

As the Court knows, post-Booker, it is "emphatically clear that the Guidelines are guidelines -- that is, they are truly advisory." United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008). A court is now required to consider the factors set forth in 18 U.S.C. §3553(a) and to impose a sentence "sufficient, but not greater than necessary," to do justice. See United States v. Williams, 475 F.3d 468, 476 (2d Cir. 2007)(discussing "parsimony clause"). Below, we identify numerous considerations which demonstrate that time served is the parsimonious sentence.


1.     To say that Urooj's actions on May 29, 2020, were aberrant is to state the obvious. Prior to that night, Urooj had never engaged in violence or associated with any group that thought violence was a solution to the systemic racism that has plagued our country for so long. She is no radical. Urooj worked for Bob Gangi's quixotic campaign for Mayor, which was part of the progressive movement that has attracted so many young people. She supported Bernie Sanders for President, messaging her friends on May 29 that she would be "[v]oting for Bernie for the primary at least so he can hold sway at convention." Text Message 5/29/2020 3:35 p.m. As Dr. Lebowitz writes, Urooj's "commitment to helping and not hurting people . . . is sincere"; indeed, it has been integral to her life. Rpt. 21.

That Urooj's unlawful conduct was out of character is sounded in many of the letters to the Court. As her close friend Salmah Rizvi, a recent clerk to a Third Circuit Judge, writes: "in the midst of the extreme emotions [that] she was feeling that night, [Urooj] engaged in behavior that is entirely uncharacteristic of her." Letter of Salmah Rizvi. Her friends were "shocked to [learn of her conduct], which displayed [such] poor judgment." Letter of Zaid Hydari; see also letter of Zachary Burk ("these acts seemed so out of character and do not correspond to the Urooj I know"); letter of Imam Mujadid Shah ("[b]ecause of Urooj's caring and sensitive nature, I felt 'how is this possible'"). One isolated act committed on a night when passions ran wild should not define a person, especially a person who has devoted herself so selflessly to helping others.



Urooj's actions on May 29, 2020, underscore the point. That night, Urooj "talked the talk," but when it came to acting she was hesitant and conflicted.[6] Urooj and Colin sought out a police vehicle parked away from protestors -- one that had been damaged so badly earlier in the evening that it was out of commission.[7] Tossing the Molotov cocktail was a way of expressing anger at those police officers around the country for whom Black lives did not matter. It was an act of protest intended to avoid exposing others to harm.

      2. Since her arrest, Urooj has further demonstrated that her conduct that night was aberrational. She has continued to do public interest work, spending countless hours on projects for Witness to Mass Incarceration and PROP. And she has worked as a member of the American Muslim Bar Association ("AMBA") on its efforts to seek justice for marginalized people. Adeel Bashir, the President of AMBA, writes this about Urooj:

> I can say with confidence and experience that Urooj is often the voice of moral reason, inspiring myself and others to think beyond our own daily lives and to use our voices and privilege in practicing law to help others. As a true testament to her character, Urooj champions for the interests of others with no ego – that is, no expectation of a reward for herself or recognition. We are all in need of better angels in our life that push us to be better versions of ourselves, working toward the betterment of humanity. Urooj is that voice, and her dedication to causes beyond her own speak to her selflessness and good virtue.

---

[6] That night, Urooj gave an interview to a reporter who was livestreaming the protest in which she provided her name and identified herself as a lawyer. Urooj made statements in that interview that were, at best, harsh and vitriolic, which she acknowledges. Those words were spoken in the anguish of the moment and do not reflect Urooj's long-held values or beliefs.

[7] Though the damage they caused was slight (the plastic on the console melted), as part of their plea agreements, Urooj and Colin have agreed to jointly pay the full value of the vehicle.


Letter of Adeel Bashir.  Any thought that Urooj might be a danger to the community has been resoundingly disproven in the two years since her arrest.  See United States v. Munoz-Nava, 524 F.3d 1137, 1149 (10th Cir. 2008)(affirming a significant downward variance because defendant's "behavior while on a year-and-a-half pretrial release . . . [was] exemplary").

       3.      Urooj has also spent considerable time seeking to understand what caused her to lose her way on May 29, 2020.  Through Pre-Trial Services, she has attended weekly individual therapy sessions for the past two years at The New York Mental Health Group.  Her therapist there, Paulina Malinowska, writes that Urooj "has been successful in addressing her cognitive distortions, impulsiveness, and consequential thinking" and has been "motivated to make desired changes in her life."  See letter of Paulina Malinowska.  Since December 2021, Urooj has also attended weekly individual psychotherapy sessions at Downtown Psychiatric Group.  (Dr. Lebowitz recommended the dialectical behavior therapy engaged in there.)  As Tracy Colon, her therapist, explains, Urooj "has been able to recognize how unprocessed trauma has impacted her mental state" and to develop "new coping strategies that help her manage stress better."  Letter of Tracy Colon.[8]  Because Urooj has sometimes used alcohol to self-medicate, she has also participated in Alcohol Anonymous meetings.

        On the recommendation of Pretrial Services, Urooj has also participated in a 12-week Focus Forward Project, which seeks "to provide both an intellectual and emotional outlet for participants as they navigate the stress and uncertainty of the pretrial phase of their federal

---

[8]     The letters of Urooj's therapists are attached as Appendix C.


cases."  The program's facilitators have written the Court in a letter that speaks movingly of

Urooj's participation:

> [W]e had a homework assignment to write a speech in response to the prompt
> "write about someone who inspires you."  All of the participants wrote about family
> members or friends, except for one participant who chose to write about Urooj.
> This participant spoke about the support Urooj had given her during our classes --
> speaking to how heard and loved she always felt in Urooj's presence.  After the
> speech, other class members spoke to how much they wholeheartedly agreed.  They
> shared sentiments of how Urooj is . . . always offering wisdom and non-judgmental
> support to others while also sharing her fears, hardships, and vulnerabilities.

Appendix D, Letter of Chantal Kim and Samantha Katz.  At our request, Dr. Lebowitz saw Urooj

again this April.  Her current assessment is encouraging:

> Ms. Rahman has systematically addressed her psychological symptoms as well as
> her underlying vulnerabilities (e.g., her prior inability to adequately tolerate stress
> and her related utilization of avoidance and alcohol).  She has also created a rich
> social environment for herself (prayer circles, writing groups, AA) that actively
> supports her new, healthy, adaptive behaviors.  Finally, she has shown that she can
> maintain these gains in the face of both chronic and acute stress, reaching for help
> when she needs it and increasingly able to rely on the skills she is learning.
> Together, these developments augur well for her future psychological stability as
> well as her ability to contribute positively to her community.

See Appendix E (current assessment).

4.      Urooj's remorse for her conduct is palpable.  The letters of her friends make

the point repeatedly.  See letter of Imran Alam ("[s]he has expressed deep remorse for the incidents

that led to her conviction"); letter of Imam Mujadid Shah (Urooj "is regretful, remorseful and

especially ashamed" for her conduct); letter of Fatima Amin (her conduct "was made in a moment

that she regrets sincerely and deeply"); letter of Cristina Castro ("I know that since her arrest she



September 9, 2022
Page 19

has reflected deeply and expressed remorse for her actions").  The letter of Dean Feerick of the

Fordham Law School is especially instructive:

> On May 29, 2020, I was shocked to see in the news that she and another young
> lawyer had thrown what was described as a "Molotov Cocktail" at an abandoned
> or parked police car.  This was not the student I had known, and when I was asked
> by a classmate of Ms. Rahman to sign a statement of support at the time, I declined
> to do so . . . .  When recently asked if I would consider writing a letter of support, I
> hesitated but said I wanted to speak with her lawyer.  I then called and spoke with
> [her attorney who] suggested that I also speak with Ms. Rahman.  I did so over
> several calls (plus a zoom meeting), asking her about her conduct on May 29th.  As
> a result, I obtained a much fuller view of May 29th and her conduct, and of her
> personal situation.  I found her extremely apologetic, remorseful and contrite as I
> listened to steps she has taken to address her conduct, including regular health-
> related therapy sessions, weekly substance recovery meetings, active engagements
> in her religion, and continued community service.

Letter of John D. Feerick.

5.      Urooj's felony conviction will cause her to lose her law license for more

than seven years.  See Plea Agreement ¶ 12.  Urooj spent countless hours attending classes and

studying in the Fordham library (perhaps as many as 2,000 hours), and that time is now lost.

Obtaining her law license enabled her to advocate for others -- in refugee camps in Europe and in

Housing Court in the Bronx -- with no thought of earning riches.  Being a lawyer gave her life

meaning, so that losing her license is a severe punishment.  See United States v. Stewart, 590 F.3d

93, 141 (2d Cir. 2009)("it is difficult to see how a court can properly calibrate 'just punishment' if

it does not consider the collateral effects of a particular sentence").

6.      Comparing cases can be parlous, but comparison of Urooj's case to the

recently decided cases of United States v. Carberry, S2 20-cr-544 (LJL) and United States v. Smith,



S1 20-cr-544 (LJL) is telling. On July 15, 2020, at 4:30 a.m., Carberry and Smith ignited a marked NYPD Homeless Outreach Unit van parked on the corner of 12th Street and University Place in Manhattan. The two then walked away but returned to the scene when they realized the fire had extinguished. Smith then poured accelerant on the van, and fire quickly engulfed it. See United States v. Carberry, Doc. 77. On these facts, the government recommended "a below -Guidelines sentence . . . of at least the 366 days' imprisonment recommended by Probation." Id. at 3.

Judge Lewis Liman sentenced Carberry and Smith to six months' imprisonment, six months' home detention, and 400 hours' community service. In sentencing Carberry, he said these words:

> The facts demonstrate that this was an aberrant act by you and your codefendant, motivated by frustrations building up over time and the emotions of the moment . . . . You have a pristine record, you have no criminal record, you expressed immediate regret for your crime, and the . . . letters that have been submitted on your behalf speak of your good character and your law-abiding nature. They speak of your concern for others, your empathy, and your commitment to justice . . . . The same adjectives appear over and over from people who have known you at different times in your life, and they appear from a wide range of people . . . . There's no need for a lengthy sentence to specifically deter you or to protect the public.

Doc. 91 at 54-56.

A persuasive case can be made that Carberry and Smith were more culpable than Urooj. The vehicle that they ignited was not out of commission but fully functional. See Doc. 91 at 51 (the court: "that van was used for the homeless"; it "played a critical role in our society"). Moreover, as the government observed, they "had the opportunity to reconsider their actions; after the initial blaze died out, they could have walked away. Instead, [they] doubled down [using]


accelerant to . . . reignite the fire." Doc. 77 at 4. And, while Carberry and Smith had no prior criminal history, neither had a comparable record of service to others. We believe that the sentences Judge Liman imposed on Carberry and Smith should inform the sentence here. As was true there, a substantial prison sentence is not needed to deter Urooj from future wrongdoing or to protect the public.

       7.     As part of the new plea agreement, we have agreed not to oppose the inclusion of the terrorism enhancement, §3A1.4 of the Sentencing Guidelines, in the computation of the guidelines range. As the Court knows, the enhancement is draconian in its effect: it adds 12 points to a defendant's offense level and elevates her criminal history to Category VI. See McLoughlin, Deconstructing United States Sentencing Guidelines Section 3A1.4, 28 Minn. J. of Law & Ineq. 51, 54 (2010)("U.S.S.G. section 3A1.4 is draconian"). It increases Urooj's Guidelines range from 37 to 46 months to 235 to 293 months (capped at 60 months by the statutory maximum). But, even if the enhancement technically applies, it should not be a factor in the disposition of this case. Indeed, the government has acknowledged as much by its recommendation of an 18 to 24 month sentence and in advising the Court that it may "choose not to rule on . . . [the] issue." See Gov't letter 5/10/22 at 3. That advisement recognizes the reality that the enhancement "ignores the individual 'history and characteristics' of the Defendant, and instead places too much weight on a questionable interpretation of what constitutes a federal crime of terrorism." United States v. Garey, 383 F.Supp.2d 1374, 1379 (M.D. Ga. 2005).


It should be obvious that Urooj is not a terrorist. She is not at war with this country or seeking to destroy our way of life.[9] As noted above, she worked tirelessly for Bob Gangi for Mayor and texted to her friends about voting for Bernie Sanders on the day of her crime. Her friends are lawyers, teachers, and other professionals, who live law-abiding and productive lives. One of her friends puts it best: Urooj is not a terrorist, rather "her life has been spent helping refugees flee[ing] from terrorism in their homelands." Letter of Salmah Rizvi.

8.      Finally, it bears note that for the past two years, Urooj has been on home detention and has worn an electronic monitoring device. Those measures do not count toward a prison term but are a significant restriction of liberty. The restrictions have kept Urooj from seeing family and friends and from attending meaningful events. Not to consider Urooj's home confinement at her sentencing would be to ignore what is plainly true. See Watts v. Indiana, 338 U.S. 49, 52 (1949)(a court "should not be ignorant as judges to what we know as men").

E.      Conclusion

More than 40 years ago, Judge Edward Devitt wrote this about sentencing:

---

[9]      Compare other cases in which the terrorist enhancement clearly fits the crime and the defendant: See, e.g., United States v. Cordoba-Bermudez, 4 F. Supp. 3d 635 (S.D.N.Y. 2014)(defendant agreed to procure weapons, military uniforms and supplies for foreign terrorist organization); United States v. Aref, 2007 WL 804814 (N.D.N.Y.)(defendant schemed to procure surface-to-air missile to be used against the Pakistani Ambassador); Unites States v. Ibrahim, 529 F. App'x 59 (2d Cir. 2013)(defendant participated in plan to blow up JFK airport on behalf of a militant Islamic group); United States v. Kaziu, 559 F. App'x 32 (2d Cir. 2014)(defendant attempted to provide material support to terrorist organization by killing United States and Somali troops); United States v. Thavaraja, 740 F.3d 253 (2d Cir. 2014)(defendant purchased $20 million of military grade weapons to support foreign terrorist organization).


> If we judges could possess but one attribute, it should be a kind and understanding heart . . . .  There is no burden more onerous than imposing sentence in criminal cases.  Would then that the judge had the wisdom of Solomon.  But absent that, and possessing plenary and awesome power, the judge can thank God for a kindly heart.

Devitt, Ten Commandments for the New Judge, 82 F.R.D. 209, 210 (1979); see also Kim McLane Wardlaw, Lessons from Judge Cardozo, 85 Notre Dame L. Rev. 1629, 1646-47 (2010)("empathy allows [a] judge to appreciate more fully the problem before her"); Woodson v. North Carolina, 428 U.S. 280, 304 (1976)(a sentencing judge must have some understanding of "the diverse frailties of humankind").

We ask the Court to look on Urooj Rahman with "a kind and understanding heart." Plainly, Urooj's conduct on May 29, 2020, deserves stern condemnation, for it is not how anyone, let alone a lawyer, should act in a civilized society.  The brutal murder of George Floyd at the hands of a law enforcement officer (one of several intolerable incidents in recent years) aroused outrage and protests, but it did not call for unlawful acts in response.  The question here, however, is this:  does Urooj Rahman deserve further incarceration for her conduct?  The answer, we submit, is "no."  As Dr. Lebowitz's initial report underscores, Urooj was a gravely compromised young woman.  She has been damaged by ██████████████████████████████████████ ████████████████ by ████ abusive partnership relationships, which have scarred her deeply; and by the injustices that she has witnessed here and abroad.  All of that combined to lead Urooj to engage in conduct on May 29, 2020, which was markedly at odds with every other day of her life



and which she regrets deeply.[10]  In the time since her arrest, Urooj has taken giant strides to address

her mental health issues and untreated trauma.  See Appendix E (Lebowitz current assessment);

see also letter of Kulsoom Ijaz ("[a]fter her arrest, Roojie gave herself the love and care she has

given to so many . . . by dedicating her time and attention to therapy for depression and anxiety,

spiritual gatherings . . . and Alcoholics Anonymous meetings."); letter of Salmah Rizvi ("I have

been impressed and inspired by her growth.  During this time, she dove deep into uncovering the

root of her childhood trauma.").

There can be no doubt that, if spared incarceration, Urooj Rahman will live a law-

abiding life, one in which she will seek out ways to help people and communities in need; that she

will continue to care for her mother, for whom she has been a life line; that she will be the empathic

and supportive person whom her friends extoll; and that she will continue in therapy to better

herself.  If Urooj is to be sentenced, not just for her crime, but for who she has been and who she

will be, then a time-served sentence is right and fair.  See United States v. Gupta, 904 F. Supp. 2d

349, 354 (S.D.N.Y. 2012) ("on this day of judgment, must not one judge the [defendant] as a

whole?").

---

[10]     Although we are not seeking an aberrant conduct departure, factors that are relevant for such a departure exist here.  See Ellis, Answering the Why Question, 1999 WL 731009 (an aberrant act is one that "stands in stark contrast to [the defendant's] posture as a responsible, hard-working, fully employed, contributing member of the community [and who has taken] appropriate post-offense rehabilitative efforts").

BRACEWELL



Respectfully submitted,

BRACEWELL LLP

/s/ Rita Maxwell

Rita Maxwell

FAEGRE DRINKER BIDDLE & REATH LLP

/s/ Peter Baldwin

Peter Baldwin